[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 390 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 391 
This appeal involves a contest of the will of Ilona Barth, deceased, who died March 27, 1939, at the age of 75 years. The immediate cause of her death was cerebral thrombosis. She had, previous to August 8, 1938, been in good health and was never "laid up" by any serious illness prior thereto. On said August 8th, Mrs. Barth slipped on a rug in her home and sustained a fractured hip, from which she sufficiently recovered to enable her to walk with assistance from others, but her general health commenced declining shortly after her injury and death resulted as before mentioned. Her husband, Dr. Louis Barth, died in June, 1932. They had no children of their own. Deceased was born in Hungary and came to this country when she was a small girl and lived in the home of Jacob Barth, her uncle, an elder brother of her future husband. She as a young lady clerked in the store of her uncle. Dr. Barth received his medical education in Germany and came to Grand Rapids to his brother's home and was soon married to decedent. Dr. Barth became a successful practitioner and he and his wife accumulated a considerable fortune, a portion of which, particularly the *Page 393 
real estate, was held in the joint names of Dr. and Mrs. Barth. Due to the depression with which most of the present generation are familiar and also by reason of the holding of certain property with his wife jointly, the value of the doctor's property was so reduced at his death that his estate proved insolvent and his surviving wife, decedent here, was required to advance upwards of $30,000 in settlement of debts against the estate.
The will in controversy bears the date August 10, 1938, and was offered for probate on petition of Herman Stern, residuary and principal beneficiary, as well as executor under the terms of said instrument.
The last will and testament of Dr. Barth made his wife sole legatee.
The probate of the will here involved is contested by 31 persons, only 7 of whom are heirs of said decedent, their relationship being that of nephews and nieces. The other contestants are nephews and nieces of decedent's husband, and friends and servants who claim under prior will or wills of decedent.
Objections to the allowance of the will were filed in probate court and upon petition of contestants were certified to the circuit court for the county of Kent for trial.
The objections to the probate of the will are the usual ones made in will contests; that the instrument was not legally executed; that testatrix was mentally incompetent; that she was unduly influenced, and that fraud was exercised in securing the execution of the instrument. The case was tried before a jury, which rendered a verdict sustaining the will and upon which judgment was entered and from which contestants have appealed. *Page 394 
The record is convincing that the married life of the Barths was one of devotion, each to the other, with nothing to indicate even that there was ever any discord in a long life of conjugal happiness; that they traveled quite extensively, making several trips to Europe, where the doctor attended medical clinics and on one occasion for medical treatment for his eyes, and at these times they visited relatives of Mrs. Barth who were living there. They also visited relatives of the doctor who lived at distant points in the United States.
All of the nephews and nieces of Mrs. Barth, excepting three, live in Hungary, and two of these three live in Detroit and one in New York City.
None of the doctor's nephews and nieces lived in Grand Rapids, excepting one nephew, and for him, a professional man, neither Dr. or Mrs. Barth had any use, because he had on more than one occasion been charged with illegal practice in his profession.
None of these heirs-at-law of Dr. and Mrs. Barth were frequent visitors at the Barth home, neither were the Barths frequent, or hardly occasional, visitors of their nephews or nieces, nor does the record disclose that any of these relatives ever rendered any assistance or advice to the Barths. It does appear, however, that the Barths were kindly disposed towards most of their nephews and nieces and frequently showed their kindness and generosity by financial aid and other kindly acts.
The estate of Mrs. Barth consisted of cash in the amount of approximately $20,000, some stock of small value, household effects, jewelry, coins, some notes of doubtful value, an automobile, some pictures, art objects, books, and a few vacant lots.
The will of decedent gives to three of her nieces certain household effects; to four of her husband's *Page 395 
nieces certain paintings and tapestry, and to one of them deceased's wearing apparel; also to certain friends of decedent in Grand Rapids other works of art and books, together with a piano, sewing machine and kitchen utensils; the will gives to her cousin, Helen Winter Stern, certain jewelry, and also silverware, pictures, rugs, and other furnishings not otherwise disposed of; to a cousin, Evelyn Stern Kaufman, she gave certain jewelry and silverware and a collection of curios; to her cousin, Doris Loraine Stern, three diamond rings, a pearl necklace, and some other articles; the residue of her estate was bequeathed to the proponent, Herman Stern, "in appreciation of his many years of kindness in taking care of me and my affairs." Mr. Stern was named as executor and trustee under the will in case he survived her, and in case he predeceased her, Helen Winter Stern and Evelyn Stern Kaufman were named as executors.
Inasmuch as the person charged with procuring the execution of the alleged will by means of undue influence and fraud is Herman Stern, proponent and principal beneficiary, we deem it advisable to go into some detail as to what the record discloses was the relationship between decedent and her husband with proponent and his family.
Helen Winter Stern, one of the beneficiaries, was a cousin of decedent and the wife of proponent. Evelyn Stern Kaufman and Doris Loraine Stern are daughters of proponent and Helen.
Herman Stern, proponent, settled in Grand Rapids in 1908 and was married to Helen in 1910. He had met the Barths prior to the time of his settling in Grand Rapids, while he was a traveling salesman, and had been entertained socially by them. Mrs. Stern was a resident of Toledo, Ohio, *Page 396 
before her marriage to Mr. Stern, and she had visited at the home of the Barths prior to her marriage. The Sterns lived continuously in Grand Rapids after their marriage, with their daughters above mentioned.
The record discloses that the Dr. and Mrs. Barth and the proponent and his wife were very good friends from the time of their marriage and were in each other's company a great deal; that practically every week, when the Barths were in Grand Rapids, the families were at each other's homes for meals and always spent their Thanksgiving and Christmas holidays together, made frequent trips to various places together, and that upon one occasion upon the return of the Dr. and Mrs. Barth from Europe the Sterns met them at the request of the Barths in New York City and were entertained there by them for several days. It is also clearly evident that the Dr. and Mrs. Barth were extremely fond of the daughter Evelyn, and that she frequently accompanied the doctor on professional calls and always spent a day or more each week at their home; that Mrs. Barth referred to Evelyn as her sweetheart, and a bedroom at her home was called "Evelyn's room." At the time of her graduation, they gave her $500 as a graduation gift, and when Evelyn left for college Dr. Barth gave her $800 toward her first year's expenses, and after Dr. Barth died Mrs. Barth continued to pay her expenses at college. After Evelyn left for college, Doris seemed to become the object of Mrs. Barth's immediate affection and she spent a great deal of time at the Barth home. Both of the children referred to the doctor and his wife as uncle and aunt. Upon Evelyn's marriage, Mrs. Barth made her a wedding present of three $1,000 bonds. The evidence in the case, even from some of the contestants, was to the *Page 397 
effect that Mrs. Barth often referred to proponent as her son. It is clearly evident that the Barths reposed confidence in Mr. Stern and that there was never any betrayal of that confidence unless Mr. Stern took advantage of the devotion of Mrs. Barth for him and his family by perpetrating a fraud upon her to secure the execution of the will in question. When Mr. Stern came to Grand Rapids in 1908, he was in the employ of a department store there and eventually became manager of the ladies' ready-to-wear department, and in 1916 he went into this business for himself and was very successful until the depression, which affected his finances to the extent that in 1932 he went into bankruptcy. For a time after the bankruptcy proceedings Mr. Stern was in very poor health and was required to take a rest for several months. Following that he entered the insurance business, which he has continued up to the present time.
Upon the death of Dr. Barth, Mr. Stern was requested by Mrs. Barth to, and he did, take charge of the funeral arrangements.
It appears from the record that Mrs. Barth's adviser immediately following the doctor's death was Harry J. Proctor, who was a coexecutor under his will and who was connected with the Grand Rapids Savings Bank in which Mrs. Barth had an account. After the closing of the bank, during the banking holiday, Mr. Proctor suggested to Mrs. Barth that their relationship should terminate. From that time on Mrs. Barth seemed to rely more on Mr. Stern for assistance in connection with her business affairs, and this relationship continued until her death.
Upon the death of Dr. Barth, Mrs. Barth, by reason of joint ownership as survivor, became the owner of certain properties in Grand Rapids known *Page 398 
as the Barth homestead, a sanitorium property, and an office building known as the Transportation Building.
Shortly after Mr. Stern's entry into the insurance business, he took an office room in the Transportation Building where he continued until Mrs. Barth's death. When he took his office there, he and Mrs. Barth entered into a contract by the terms of which Mr. Stern was to have the management of the Transportation Building, to collect the rentals, pay the expenses of maintenance of the building, and was to have for his services one-half of the net receipts from said building. As a matter of fact, the building was not profitable, and although Mr. Stern improved the situation to some extent, the rentals from the building were not sufficient to pay the taxes, costs of maintenance and repairs, and so Mr. Stern received nothing but the use of his office, and a stenographer, for his services as manager of the building. This arrangement was made November 16, 1933, and at about that same time Mrs. Barth gave to Mr. Stern a power of attorney to transact business for her and which authorized him also to sell and convey real estate. However, Mr. Stern never made use of this power of attorney in any way until just prior to the death of Mrs. Barth, when he sold the property known as the sanitorium property for $20,000.
In August, 1936, Mrs. Barth executed and delivered to Helen and Herman Stern a deed conveying her residence and the Transportation Building to them subject to an annual income of $100 per month for herself for life. The residence evidently was quite a large one, a portion of which she leased, and she received during her lifetime the rent from this.
The facts given by Mrs. Helen Stern in connection with the execution and delivery of the deed to *Page 399 
the homestead and Transportation Building were substantially as follows: Mrs. Stern said that Mrs. Barth had written her at Ottawa Beach, where Mrs. Stern was at that time in their summer home, requesting her to come in and spend a week at her home; that she came in on the 19th of August, 1936; she claims that Mrs. Barth said to her: "I wanted you in because I was lonesome. I wanted you to visit us. I have been talking so long about deeding you some of my property. I want to have my deed — I want to have the deed witnessed. I am giving you the Transportation Building and the house." Mrs. Stern said that Mrs. Barth had mentioned before that time that she was going to deed to her and her husband the Transportation Building and the sanitorium and that Mrs. Barth further said: "I am giving you the house with the Transportation Building because I consider the Transportation Building a lemon, so I am giving you the house to offset the Transportation Building." Mrs. Stern testified that the deed was executed the following morning by Mrs. Barth and witnessed by Lilly Hough, the maid, and by Peter Kleaver, the chauffeur, and that later Mrs. Barth went out with Mr. Stern to have the deed notarized.
That the Transportation Building was something of a "lemon" is shown by Mrs. Barth's income-tax return and her books, from which it appears that the total receipts from the Transportation Building from November 6, 1933, to March 27, 1939, were $62,852.44 and that the expenditures for the same period, exclusive of taxes for the years 1933 and 1939, were $63,394.92.
The record further discloses that almost daily from 1936 down to the time of the death of testatrix, she was in contact with proponent; that during the summers, when Mrs. Stern was at the summer home, *Page 400 
proponent made his home with Mrs. Barth; and that after Mrs. Barth's fall in August, 1938, until her death, the Sterns practically lived at the Barth home.
We find nothing in the record to indicate any dishonesty or lack of loyalty in Mr. Stern's dealings with Mrs. Barth covering the entire period on which testimony was taken.
The record in this case clearly shows that both Mrs. Barth and her husband were what counsel called "will-minded;" that Dr. Barth executed many wills during his lifetime, the last one bearing date September 22, 1931. On the same date Mrs. Barth also executed a will practically identical in its plan and provisions with that of her husband. By his will, if Mrs. Barth survived, she was the sole devisee and legatee; by her will she left everything to her husband, if he survived her. The contingent bequests in both of said wills were practically the same. Members of both the families of Dr. and Mrs. Barth were given bequests under these wills. Also members of the Stern family were mentioned there. That while said wills of September 22, 1931, were practically identical, that they were not intended as mutual and reciprocal was shown by an express provision in each will to that effect by this statement: "That the survivor shall be free to revoke or change his, or her, will if he, or she, so desires."
Between the date of Dr. Barth's death and Mrs. Barth's death, she had prepared and executed several wills and codicils and also had prepared at least one other will which she did not execute. We think no useful purpose would be served by going into the details of the various wills made by Mrs. Barth. At least three or four of her wills were prepared *Page 401 
by able counsel. At least one was prepared by Julius Amberg; one, and possibly two, by Judge Hoffius; at least one by Judge Harry B. Jewell, and at least one was prepared by Harry J. Proctor, who was connected with a Grand Rapids bank and was a coexecutor of her husband's will. In Mrs. Barth's 1931 will she made specific bequests aggregating more than $100,000. In December, 1932, she executed a will in which the specific money bequests amounted to $26,000. In August, 1933, in a will prepared by Judge Hoffius, her cash bequests totaled $22,500, and in April, 1934, in a will prepared by Judge Hoffius, cash bequests were reduced to $6,000.
In practically all of the wills that Mrs. Barth made, prior to the one bearing date August 10, 1938, her chauffeur had been a beneficiary to the amount of $500, and in some of the wills a bequest had been made to a friend, Mrs. Oppenheimer, and also a friend, Mrs. Messenger.
It appears from the record that sometime prior to the making of the last will, Mrs. Barth had become somewhat incensed towards her chauffeur, Peter Kleaver, because she claimed he had deceived her about having a telephone in his home. She had desired that he should have one so that she might call him when she desired to, but he had claimed to her that he had no place where he could be called. Decedent discovered that for some years there was a phone in the home of Mr. Kleaver's son-in-law where he could be reached by phone and she then told proponent, in fact told others, that she was very much hurt by her chauffeur's deceit, and she proposed to make a new will and leave him out as a beneficiary. The testimony of proponent is to the effect that about August 1st the decedent directed *Page 402 
him to have a new will prepared identical with her then last will with the exception of the bequest to Peter Kleaver. The proponent testified that her will, which was in his safe, was given by him to the stenographer in his office, Mrs. Bernice Braunschneider, and he directed her to copy this will as it was, leaving out the bequest to Peter Kleaver. Both Mr. Stern and Mrs. Braunschneider testified that attached to the will in question were two codicils, one revoking the bequest to Mrs. Oppenheimer and one revoking the bequest to Mrs. Messenger, and Mrs. Braunschneider testified that she copied the exact language of the will, leaving out the bequests to Mrs. Messenger, Mrs. Oppenheimer and Mr. Kleaver. She testified that this will from which she copied was signed by the name "Ilona Barth" and purported to be witnessed by a Miss Loveland and a Miss Lemon, and testified that this will from which she copied was dated either 1935 or 1936, but she was unable to remember which date. Mrs. Braunschneider had been in the employ of Mr. Stern since November, 1936, and Miss Loveland was the lady whom she succeeded in the office of Mr. Stern and Miss Lemon was a young lady employed in an office in the Transportation Building in 1935 and 1936. This will was copied by Mrs. Braunschneider during the first days of August — 1st, 2d or 3d. Both Miss Loveland and Miss Lemon testified that they witnessed a will for Mrs. Barth in the office of Mr. Stern, but neither of them was able to tell definitely whether it was in 1935 or 1936. Mr. Stern testified that after Mrs. Barth received her injury, she asked him if he had had her will prepared as directed. He told her he had, and she requested that he bring the will to her for execution; and that he brought the proposed will from his office *Page 403 
to Mrs. Barth in her bedroom and also brought with it the will from which this was copied. The will was signed by Mrs. Barth on the 10th of August, 1938, and was witnessed by Mrs. Barth's maid, Lilly Hough Bergren, and by Dr. Orville M. Barton, a dentist who had his office and lived in the Barth homestead.
No one, so far as the record here discloses, seemed to have any knowledge of what became of the will from which Mrs. Braunschneider claims to have copied the instrument in controversy. Proponent claims to have taken said will together with the one to be executed to the bedroom of Mrs. Barth and that the last he saw of it, it was lying on Mrs. Barth's bed. Mrs. Stern testified to having been in the bedroom when her husband came in with the papers and that he handed the old will to decedent and read aloud to her the new one. No one other than Mr. and Mrs. Stern claims to have seen any papers on the bed. Believing that the significance of the loss of this will from which it is claimed the will in suit was copied and the inference to be drawn therefrom was solely for the consideration of the jury, we will refrain from further discussion of the facts bearing upon its loss.
The trial of this case in the court below continued over a period of nearly a month, during which time 66 witnesses were sworn, 49 for proponent and 17 for contestants.
The testimony relative to the mental competency of decedent on the date of the execution of the will and immediately preceding this date, that is, from August 8th, the date Mrs. Barth fell and injured herself, and for several weeks thereafter, was in sharp conflict. The testimony showed ample opportunity for the exercise of undue influence on *Page 404 
decedent by proponent. There was no direct testimony of any fraud practiced by proponent, and very little testimony from which an inference of fraud could be drawn. However, all of these questions were submitted to the jury, which found against contestants' claims on each question involved. No motion for a new trial was made, so no question can now be raised as to the sufficiency or weight of evidence in support of the verdict.Peters v. Aetna Life Ins. Co., 282 Mich. 426; Gaufin v. Valind,268 Mich. 269; Burton Township v. Wilson, 258 Mich. 22.
So upon this appeal the verdict of the jury sustaining the will must stand unless prejudicial error was committed by the trial judge in the admission or rejection of testimony, in the charge as given, or in the failure of the trial judge to charge the jury as requested by contestants.
Contestants have grouped the errors complained of under the following heads:
"1. Error in instructing the jury that there was no proof that decedent did or did not have the benefit of independent counsel or advice.
"2. Error in instructing the jury that the only question involved was the mental competency of Mrs. Barth or the legality of her mental processes or whether she made a will that the law approves of.
"3. Error in instructing the jury that the alleged will was copied from an earlier will and in unduly emphasizing the claim and testimony of proponents in that respect by frequent and unnecessary repetition.
"4. Error in instructing the jury as to the character and degree of proof necessary to establish fraud in the procurement of the will.
"5. Error in receiving testimony as to disbarment of Isaac Barth. *Page 405 
"6. Other rulings with respect to the admission or exclusion of proofs and the order of proof."
Counsel has discussed the questions involved in the foregoing order and we will endeavor to dispose of said questions in the order in which counsel has discussed them.
1. The court was requested by counsel for appellants to charge and instruct the jury on the question of the decedent having had the benefit of independent counsel or advice with respect to the will in question as follows:
"There is no proof in this case that Ilona Barth had the benefit of any independent counsel or advice with respect to this purported will. These circumstances present a situation which gives rise to a suspicion of wrongdoing which calls for satisfactory explanation from Herman Stern. However, the force and effect of these circumstances, as well as the explanation of them offered by and in behalf of the proponent, Herman Stern, is solely for you to determine in the light of all of the facts and circumstances of this case."
The trial court gave the following instruction on this question:
"There is no proof in this case that Mrs. Barth had or did not have the benefit of any independent counsel or advice with respect to this purported will. These circumstances present a situation which gives rise to a suspicion of wrongdoing which calls for satisfactory explanation from Herman Stern. However, the force and effect of these circumstances as well as the explanation of them offered by and in behalf of the proponent Herman Stern is solely for you to determine in the light of all the facts and circumstances of this case." *Page 406 
We think in view of the record in this case, which shows that prior to August 8, 1938, the decedent was in good health, had a wide acquaintance among professional men in the city of Grand Rapids, and had upon numerous occasions prior consulted and taken the advice of numerous wellknown attorneys, and having had ample opportunity to seek and obtain legal advice, if she so desired, that the charge of the court on that phase of the case was as favorable to contestants as they were entitled to, and that the court in refusing to give the charge in the language requested by contestants and in its charge to the jury as given committed no prejudicial error.
2. By this assigned error counsel insists that the trial court, by the following voluntary statement made during the cross-examination of proponent's witness Helen Stern, committed prejudicial error: During the examination of proponent's witness, Helen Stern, she was asked if she had not said that Mrs. Barth was in a state of coma for three weeks up to the time she died, and she replied that she may have written it. Whereupon the court, without the interposition of any objection by proponent's counsel, made the following statement:
"Let me say this to the jury, that all this has nothing to do with the case, except as it may develop in determining whether or not she was mentally competent on the 10th of August, 1938. That is the point. That is, the only issue in this case, is whether or not on the 10th of August, 1938, Mrs. Barth made a will that the law sanctions. That is the only question in the case. There is no question of accounting in this case, so far as one person owing another, and it would not be material or competent or relevant in any way, shape or manner unless it had some bearing upon Mrs. Barth's ability to know and appreciate *Page 407 
and make a will, freely and of her own judgment. The question of fraud is in the case, yes, but if she was acting free from fraud when she made this will, it would be a good will if she made it. If she was without undue influence it would be good. If she had the mental capacity it would be good, but the whole issue here and I make this statement now very definite, that there is only one question for you to decide in this case and that is whether or not the 10th of August, 1938, she made a will that the law approves of, or a will that comes within the provisions of the law as being her last will and testament."
It does not appear that there was any impelling reason for this interpolation on the part of the court; however, the court therein correctly stated the questions involved and the law applicable thereto and we find that no prejudicial error was committed.
Counsel also claims that the court erred in sustaining an objection to questions propounded to contestants' witness Laura B. Davies during an examination as to the value of certain articles of clothing and jewelry of decedent contained in a list of individual items of property that Dr. Barth had insured before he died. In sustaining such objection the court said:
"Well, I think it would be entirely incompetent. I will sustain the objection. I must feel constrained to say to the jury that after all we are trying the question of the mental competency of Mrs. Barth or the legality of her mental processes on the 10th of August, 1938. I don't want you to forget that that is what this issue is about."
We find that the court was correct in sustaining this objection inasmuch as evidence as to the value placed upon decedent's wearing apparel and *Page 408 
jewelry as far back as 1932 was incompetent and could have no possible bearing upon the issues involved in this will contest.
3. Here counsel claims error on the part of the court for sustaining an objection to a question asked of proponent during his cross-examination with reference to this provision in paragraph 3 of the will in question "I give, devise and bequeath all of my residuary estate, real or personal, remaining after the satisfaction of the bequests hereinbefore mentioned to Herman Stern in appreciation of his many years of kindness in taking care of me and my affairs."
"Q. Was there a similar provision in this 1935 will?
"A. Mr. Harrington, this is an exact copy of the 1935 will. * * *
"Q. In August, 1935, how long had you been taking care of Mrs. Barth and her affairs?
"A. Well, I was not taking care of Mrs. Barth nor her affairs. She was advising with me and I did everything I could to help her with all of her affairs.
"Q. She said in her will that she did this in consideration of your many years of kindness in taking care of her and her affairs. Now I ask you, in 1935 how long you had been taking care of * * * Mrs. Barth and her affairs? * * *
"The Court: One difficulty with the question, it assumes that he had been taking care of her affairs. He didn't say that.
"Mr. Harrington: But the will did.
"The Court: He didn't draw the will. He is not responsible for the will according to his testimony.
"Mr. Harrington: Can I ask him how long he had been taking care of her affairs?
"The Court: He didn't say he was taking care of her affairs. He recited to you what he did for *Page 409 
her but he said he didn't frame the language nor draft the phraseology of the will. So the question is based upon something that * * * somebody else wrote, so far as the testimony now stands and not his words. If he had dictated the phrasing himself and was responsible for it, he would be accountable for it. But his position is, his testimony is, that he didn't dictate the sentence. He didn't draft the will that was copied and he didn't take care of her affairs, but he performed some services for her. So the question is not based upon any statement by the witness nor an admission by him. Consequently he should not be required to answer."
We find that the court did not err in sustaining an objection to this inquiry because the questions assumed something which the witness had said did not exist. We find no prejudicial error here.
It is the claim of contestants that the court erred in his instructions to the jury by unnecessarily repeating to the prejudice of the contestants the claims of the proponent with respect to the drafting of the purported will as follows:
"Proponent claims that at the express direction and request of Mrs. Barth he took the will executed in 1935 or 1936 to his office, where the instrument in question here was prepared by Bernice Braunschneider; that Mrs. Braunschneider copied the will that had been executed by the witnesses Loveland and Lemon, except as he had left out the provision in the will for Peter Kleaver and gave effect in the will to the two codicils revoking the bequests to Miss Messenger and Mrs. Oppenheimer, but that in all other respects the will prepared by Mrs. Braunschneider was exactly like the prior will, and that the provision[s] with reference to the family of Herman Stern and himself were exactly as provided in the will which was copied. * * *
"It is admitted by Herman Stern that he took a will to his office and directed Mrs. Braunschneider *Page 410 
to copy the will, leaving out of the will the names of Mrs. Oppenheimer and Miss Messenger and Peter Kleaver, in that way producing the purported will here in which he is named as residuary legatee to take the principal portion of her estate. * * *
"The evidence produced by the proponent further tends to show that the paper signed on the 10th of August, 1938, was copied from another will executed by Mrs. Barth either in 1935 or 1936. Proponent claims there was only one change made in the will now offered for probate, which change left out the bequest to Peter Kleaver."
The charge of the court to the jury was a lengthy one occupying 37 pages of the printed record. We said inHanna v. McClave, 273 Mich. 571, where the instructions were 20 pages in length, "It is difficult to extend instructions without needless repetition and danger of faulty reiteration."
In each of the paragraphs above quoted the court correctly stated provisions of the law applicable to the questions of fact in controversy, and we do not think it can be said that there was either faulty reiteration or undue repetition in the court's charge.
Here it is contended that the court erred in refusing to permit counsel for contestants to argue to the jury that it might be legitimately inferred that there had been a substitution of pages in the document given by proponent to Mrs. Braunschneider for use in preparing the will in controversy. During such argument counsel for proponent objected to same and insisted there was no proof in the record that there had been any substitution of pages, and no proof of circumstance to justify such an argument. The court in sustaining the objection said:
"It is a matter well known that anybody who has got a typewriter, if he is intelligent, can write on *Page 411 
it, but there is no proof here and no insinuating proof in the case that anybody copied any paper other than as the proofs show. * * * There is no proof direct or otherwise that anybody copied any other will connected with this issue or copied any part of it."
We think contestants' complaint here is without merit. We find nothing in the record to justify any argument that there had been any substitution of pages in the instrument from which Mrs. Braunschneider copied the will in suit, and we must therefore hold that the ruling of the court and his comment above referred to was in no way prejudicial.
4. Counsel assigns error for failure of the court to give the following instruction to the jury:
"Fraud in the inducement or procurement of a will, like fraud in other cases, is seldom exercised openly and is not usually susceptible of direct and clear proof. Fraud is not to be lightly inferred, but its existence or nonexistence must usually be determined by circumstantial evidence, and it may be inferred from facts and circumstances which convince the unbiased mind that it exists. In order to establish fraud, the circumstances must be such as reasonably to justify the inference that fraud exists. Fraud need be proven by a preponderance of the evidence only."
The court gave this requested instruction verbatim excepting that he omitted the word "only," appearing at the conclusion of the paragraph. Counsel further claims error because the court, after giving the foregoing instruction, charged the jury as follows:
"To establish fraud it is necessary that the contestants prove that the proponent Herman Stern *Page 412 
misrepresented material facts or failed to disclose material facts to Mrs. Barth and that she relied on the misrepresented facts if any facts were misrepresented in executing her will, or that she would not have executed her will as she did had she known material facts which Herman Stern failed to disclose if he did fail to disclose material facts.
"Fraud is not to be lightly inferred, but must be clearly made out and proved, and fraud cannot be inferred from circumstances of an equivocal tendency of [or?] uncertain nature. Fraud cannot be established by proof of facts which are consistent with honesty."
We think we can best dispose of these alleged errors by asserting "They are without merit."
5. In this division of their brief appellants claim prejudicial error was committed by the court during the cross-examination of Cecelia Barth relative to the disbarment of her brother, Isaac Barth. Both were witnesses, and both are contestants claiming under a former will of decedent made in September, 1931. Witness had stated that her brother Isaac was a lawyer. She was asked if he had not been disbarred in Arizona. Her answer was that she did not know, but that she had heard it. Objection was made to this testimony but was overruled by the court. We are well aware of the rule that the scope of cross-examination of a witness is a matter to be governed by the sound discretion of the court. We think that here there was an abuse of discretion, and thus the question is presented, was it prejudicial? At the time this testimony was admitted, it appears that there was already testimony in the record that decedent had information that Isaac had been disbarred in Arizona for dishonesty in the handling of a minor's estate. This latter testimony had a legitimate place in the case for the purpose of *Page 413 
showing the state of decedent's mind, and why she might desire to eliminate him as a beneficiary from a former will or wills. We hold that under these circumstances no prejudicial error resulted.
6. Error is here assigned because of the receipt of the purported will in evidence before the production of both of the attesting witnesses thereto. The first witness called by proponent was Dr. Barton, one of the attesting witnesses to the will. The next witness called was one Mary G. Kirkwood. An objection was made by contestants to the receipt of the testimony of Miss Kirkwood before the other attesting witness was produced, at which time the following occurred:
"Mr. Linsey: Well, this witness is very short, Your Honor, and she is very busy. * * *
"Mr. Harrington: I will consent to it if you want to get her out of the way first.
"Mr. Linsey: I expect to put on several witnesses before I put Miss Hough on."
Miss Hough was the other witness to the will. Following the testimony of Miss Kirkwood, a large number of witnesses were called by proponent before the other attesting witness was called. It does not appear from the record that any objection was made to the reception of the testimony of any of the other witnesses who preceded the testimony of Miss Hough, the other attesting witness. We know of no statute, rule, or holding requiring that in a will contest both attesting witnesses must be called before the will is received in evidence or the testimony of other witnesses is taken. In Re Paul's Estate,289 Mich. 452, 463, we said:
"Both because we think it is the better practice, and because under our statute* it is an implied *Page 414 
requisite, it is our conclusion that in the event due execution of a will is contested, the proponent should produce in court for examination at least two subscribing witnesses, if they are within the court's jurisdiction and competent to testify."
In the instant case both of the attesting witnesses were produced in court, and both were sworn by proponent and testified before completing his case. One of them was sworn before the purported will was admitted in evidence, and the other was produced and sworn during the progress of proponent's case, which is a sufficient compliance with the rule laid down by us in Re Paul's Estate. No error was committed by the reception of the testimony of the witnesses in the order in which they were produced and testified.
Under this division counsel for appellants contend that there was prejudicial error on the part of the trial court in sustaining an objection to a question asked witness Essie Price Zarnosky as to what one of the attesting witnesses, Dr. Barton, had said to her immediately after the execution of the purported will. Proponent's witness Barton had been asked on cross-examination if he had not said to Essie, "I don't see why he [meaning proponent] wants her to sign any paper in her condition." Witness Barton denied that he had made such statement. Counsel for appellants produced Mrs. Zarnosky for impeachment purposes, as they claimed, and witness testified, when Dr. Barton came downstairs after attesting the will, he stopped and talked to her, and that she said to the doctor "What do you think of Mrs. Barth?" An objection was made by counsel for proponent to any conversation between witness and Dr. Barton, which objection we think was properly sustained by the court. Counsel for appellant stated: *Page 415 
"It is our recollection that the preliminary question was asked of Dr. Barton as to what was said at that time.
"The Court: Well, if it was, that is not the way to ask the question."
We find that it was not error to exclude the testimony as to the conversation between witness and Dr. Barton, as same would be clearly hearsay until a proper foundation had been established for an impeaching question. We think there is no question but that the contestants had a right to examine the witness as to Dr. Barton's alleged statement to her for impeachment purposes, and that the trial court in his statement "that is not the way to ask the question," gave contestants an opportunity to proceed to lay a proper foundation for impeachment of the witness Barton, of which counsel did not see fit to avail themselves. We said in Field v. Magee, 122 Mich. 556,559:
"However this may be, we think a clear intimation was thereafter given by the circuit judge that he would consider a new offer of this testimony, and no such offer was made. In fairness to the trial judge, the offer should have been renewed. We think the defendant is not in position to complain of this ruling."
Applying this to the instant question, it is our determination that the court did not err in refusing to permit the witness, Mrs. Zarnosky, to testify to the conversation between her and witness Barton.
Referring again to the charge of the court, we find that the trial court charged the jury that the relationship of proponent to decedent was of a fiduciary character, and that as a matter of law the presumption was that the proponent had exercised undue influence over decedent which required a close *Page 416 
scrutiny of the facts; that while it was a rebuttable presumption it necessitated testimony to overcome it. We think that, if the court was correct in his finding as a matter of law that the relationship of proponent and decedent was such as to constitute a confidential one, creating a presumption which required testimony to overcome, the charge of the court on this branch of the case was as favorable to contestants as they were entitled to.
In order to determine whether prejudicial error was committed in the charge of the court, in any case, it is necessary to consider the charge in its entirety, and from a careful review of the lengthy and exhaustive charge of the court to the jury in the instant case, we find no prejudicial error was committed.
We believe we have discussed all of the assignments of error by appellants that merit discussion, and we find no reason for disturbing the verdict rendered by the jury nor the judgment entered thereon.
Judgment is affirmed, with costs to appellee.
SHARPE, C.J., and BUSHNELL, BOYLES, NORTH, WIEST, and BUTZEL, JJ., concurred. McALLISTER, J., took no part in this decision.
* See 3 Comp. Laws 1929, § 15541 et seq. (Stat. Ann. § 27.2641et seq.). — REPORTER. *Page 417